Good morning, Karen Vogel on behalf of the FDIC as Receiver for Washington Mutual Bank. And I'd like to actually save half my time for rebuttal. I think I don't have a whole lot to add to what our briefing was. I want to be responsive to the questions that the Court might have, and I was mindful of the argument right before us where the Court was talking about also a thought motion and some of the issues that came up in that case. And so I guess I start with, we I know are here, I guess with a burden in this Court, but not the burden on the thought motion. And it is an over-review, and I'd like to just talk about some of the issues that we think were lacking that they were unable to show in the Court, in the trial court. And of course, we have a complicated procedure here because this one was decided first in state court. It was removed after the FDIC became the receiver. So in an odd sense, we're really reviewing Judge Bendix's order. I've never sat on appeal of an order from Judge Bendix. That is, that would be the case. You are reviewing an order of the state court. Which was incorporated by reference. So it's now, but I guess. Yes, correct. And I believe that procedure was all followed correctly, but it was complicated. Oh, that seems right. We're here. There are really, I think that the probable cause element of the malicious prosecution action comes down to two things that the Kenyon View has pointed at. One is this assignment issue that we addressed fairly fully in our reply brief, and I'm happy to answer any additional questions on that. And then also the Rittenhouse email, both of which I think don't come to the level of showing lack of probable cause. For me, I'm now speaking only for myself, the assignment issue is a non-starter. On the other hand, it seems to me, again, speaking only for myself, that you've got problems resulting from that Rittenhouse email. As I construe that email, Rittenhouse, who worked at the relevant time for Homeside, is saying, we got that first notice that was forwarded to us from SCME, the notice sent by Kenyon View to SCME on December 15th. We screwed up. We didn't do anything about it. That's consistent with the later statement in the telephone conversation, it fell between the cracks. And that email is flatly inconsistent to the representation made by Homeside in the state court the first time around, and the court of appeal on that first appeal, the one that actually went to the California court of appeal, says Homeside has no record of having received any notice. That's false. That's just plain old false. Now, whether it was a deliberate lie or whether it was a statement out of ignorance, it was false. And let me talk about that particular issue, because I think there are a lot of things that go into that. Number one, let's talk about the statement was, named Roberta Andrews, I believe is the name. SCME, correct. And she says that she sent it the first time that she ever appears at any point in kind of the facts, or the way we can see her, is when we noticed that she made a phone call to Gloria Seidenblatt. That phone call was made on January, or after she received the January 21st letter, not the December 15th. And so if you read the e-mail from Holly Rittenhouse. I have it in front of me. And I don't, but I'll try and tell you. My recollection of it is basically that we received, it says we received notice from SCME. What it doesn't say is when it received that notice. It doesn't say we received. Let me read you. Maybe you want to get the e-mail so we can reason together, as a former president of ours once said. And when he said we reasoned together, that usually meant the other person was in trouble. Okay, I'm looking at it. Okay. So I'm in the paragraph that begins, several issues happened on this loan. Are you with me? Yes. Okay, number one, the borrowers stopped making payments on their lease, stopped making their lease land payments first. Now we know that that was on November 1st when they stopped making payments. SCME was notified, Roberta, and she sent to HSL. HSL received notification, but we did not get it to the right department. So we did not act quickly to this notice. Number two, the borrowers then stopped making mortgage payments. We know that they were in default on the mortgage by December. I don't know when they stopped making payments, but we know they were in default sometime in December. That's when we started foreclosure proceedings. Well, there were two notices sent by Canyon View to SCME. One was sent on December 15th, and the other one was sent on January 21st. Yes. This says they stopped making their lease payments, notice was sent, then the borrowers stopped making mortgage payments. We know that at the latest they stopped making mortgage payments in December. We know that the second notice was sent on January 21st. The only notice that could be referred to then is December 15th, the first notice. You know, I'm not certain exactly the dates of when. It says that they stopped making payments. I don't know if their last payment was a December payment, if it was a January payment. We can tell. We know from other parts of the record they quit making lease payments on November 1st. Yes, but I'm talking about the mortgage payments then, the next one. We also know that they were, quote, in default in December. Now, when they quit making payments, I don't know, but obviously they had to quit making payments in order to be in default. And let me say, too, that we had objected to this declaration in the trial court on the basis that it's hearsay. That the e-mail is hearsay? The e-mail is hearsay because it's based on hearsay, because all of the information that is there is based on hearsay. Now, compare this to- Now, she's an employee of HomeSite. You are the successor in interest of HomeSite. Correct. This sounds like a statement from you, that is to say somebody who isn't your real employee, but by virtue of the assignments and then your takeover is your employee. This is a HomeSite employee making this, writing this e-mail. Now, let me- The ordinary course of business. Okay, overruled. Let me move on, okay? Because there are many facets to this particular e-mail. If you look at early on, before the litigation began, there was a phone conversation between Cary Seidenglanz and McCrodden. I think it's his last name. McCrodden says it fell between the cracks. Pardon? It fell between the cracks. And it also references the fact that we received this. So there was no question but that they received it. There still is a question of when. There's an issue of fact. I think the e-mail goes a long way to answering that. There's an inference that could be drawn from the e-mail, but there is also an inference that could be drawn, that Roberta did not send the first one, she sent the second one. And by that time- I look through the sequence, by which it seems to me- I understand. Meaningfully obvious that the likely explanation is that this e-mail is referring to the first one. It's possible by a stretch of imagination and a distortion of the language in the e-mail that it was the January 21st e-mail, but that seems to me a very unlikely reading of the e-mail. But now let's go back one step further, and that is that the statute requires that notice be served and it be served on the lender. And the Court of Appeals decision said service on SCME is not service on Bank Boston. I'm not sure it says served. I think it says sent to. The statute? Yeah. And the contract says sent to either the original mortgagee or the SME. And I think the original mortgagee is SCME. The original mortgagee actually was the Quinta. The Quinta, okay. So that would not have been- Well, but then we're sending it to an SME. Correct. But the point being that at the end of the day, was notice sent, was not notice sent? What about this piece of information? Malicious prosecution actions say that those kinds of issues about when you receive discovery, didn't receive discovery, should be dealt with in the trial court, that they should be dealt with as a sanction issue, not as a malicious prosecution action. What bothers me is, and this is what bothered Judge Mendix, is that we get the first trial court proceeding, then we get an appeal to the Court of Appeal, and through that entire period, there are representations from home side that we never got any notice. Now, let's go- Now. And afterwards, when we're doing discovery later, in August of 2000, I think I got my dates right, all of a sudden this email shows up. And that's quite in conflict with what had been represented to the State Court's fires at this time. But it's not in conflict with, even assuming that's the case, it's not in conflict with what the claims were that were made in the complaint. The first claim in the complaint, the claim that went to the Court of Appeal, was about, it was for declaratory relief. The parties were in, they had a very basic dispute about whether there could have been a lien in place, and Canyon View continually disputed, no, there was not a lien, you didn't have a lien, you didn't have a lien, you didn't have a lien. Court of Appeal, that was the declaratory relief action. The second action was for equitable lien to be created in case notice had been given. Right. But what bothers me is that we have a representation to the trial court that is false. And that should be dealt with in the trial court. Well, it was dealt with in the trial court by Judge Bendix. On the malicious prosecution action, not in the underlying action. That's absolutely right. And Judge Bendix says that's enough for me to allow the malicious prosecution suit to go forward. I'm now talking about an experienced trial court judge. I happen to know of Judge Bendix. She's not an anonymous figure to me, a careful trial court judge. And her judgment is there's enough to go forward here with a malicious prosecution suit. Okay, let's talk about then the other elements. Because I fear I will not convince you on that one. I'm just my colleague, so these may not be wasted words. Okay, I do believe that there is... Let me ask you one question. Sure. That might provide at least some support for your argument. Isn't there testimony that after the second notice got to, what is it, SCM or... SCME. SCME. Yes. They called... They called Gloria Steinmeier. That's correct. And they said, this is the right name. It's not Bank, whatever it is, Bank of Boston. And this is the right address. Now, it seems to me that if they had forwarded the first one, that was an unnecessary call. That would seem to be the case. The other thing about that is that when Gloria Seidenglanz sent the letter, she also attached to it the three-day and the 60-day notice, as well as the other information. And Carrie Seidenglanz also sent a letter on the 21st that would have gone to, that precipitated SCME from making the call in the first place. But so that those... There was a source for getting those documents to HomeSide, and that source was Gloria's letter on the 28th. So if they were in the files and they found it at some point, it's difficult to know from this record whether it was because it was sent initially or was there after that first, the December notice was sent, or whether it came as a result of Gloria Seidenglanz's letter. And the first time that it was brought to Canyon View's attention was in January after they received the second notice. And that's, like I said, that's the first time that Roberta Andrews, that we have any indication that she entered the scene. We have no indication other than that being the first time that she entered the scene. I'm sure you're speaking absolutely precisely, but I missed you when you were saying the first time we have any indication that Roberta Andrews was seen. Could you kind of go back over that? Because her name, and the first time that we see any connection where she says, I saw this, and I have some reason... She talks about their procedure, and I understand that. But the first time that she said, I follow that procedure, is that time, after January 21st. When, after January 21st, she got the January 21st letter, so she got it sometime after January 21st. And at that time, she called Canyon View. And we do know that that's the case. And that's why Gloria Seidenglanz then sent the letter with the attachments to Home Site directly. Yeah, I have an aside question that may not prove to be very important. In the Rittenhouse email, after we got through the 123s, Rittenhouse says to Steve, who's the recipient of the email, if you want to pull this file and see what you can find out on your end, what file is she talking about? Do we have any idea about a file? You know, my understanding is that there was some dispute about these kinds of loans at that time. I don't know, frankly, I don't know. So obviously, Rittenhouse is going back and looking at pieces of paper in order to reconstruct this. It appears, or that somebody did. Frankly, I'm not sure that she did, but somebody did, and then gave information to her. There's some pieces of paper floating around. As far as I can tell, we don't have those pieces of paper in the record. I think that is correct. Other than the fact that we do have, we don't know what's there. We do know what was sent to her. We know that what was sent to her was a letter in January, and then we do know that Gloria Seidenklein sent the letter directly to Homicide on January 28th. Now, one last point, and this is just a law point. You heard the discussion in the prior case as to the standard that must be satisfied for a plaintiff in a malicious prosecution case to survive a slap motion, and you're in agreement that the standard is not that the plaintiff in a malicious prosecution case has to show probability of success at this point. You know, I think it has to show something more than an unrebutted prima facie case. I do think it's more than that, and for that I will cite you to the Gilbert v. Sykes law, which says that the anti-slap motion should be granted if defendant's evidence supporting the motion defeats the plaintiff's attempt to establish evidentiary support for its claim. Yeah, or I'll give you from the Linder case from the California Supreme Court. It's quoted in our case in Mindy's Cosmetics, which I think you people have cited or not. The language from our case in Mindy's is, reasonable probability in the anti-slap statute has a specialized meaning. The statute requires only a quote, and this is now quoting from the California Supreme Court, a minimal level of legal sufficiency and triability. That's what the California Supreme Court tells us. If I could get now beyond the probable cause element, because again, I think you have to show... You have to show something. But for probable cause, you have to show that there's no attorney that would have brought this case based on what you have. There's no reasonable attorney. If the California Supreme Court had written that, I'd be happy to accept that statement. But that's what you have to show for a malicious prosecution action. That is, for a malicious prosecution action, you have to show no reasonable attorney would have found that. And I think that's a very difficult standard to say, that based on this Rittenhouse email, that no reasonable attorney would have brought that action, brought the action for declaratory relief and also for the equitable lien, which were kind of in the alternative and based initially on tenability of the legal theory, which is exactly what was decided by the Court of Appeal. The factual issue went back. So you asked for... In effect, you said, if it turns out that we did get notice, we want relief from the forfeiture. Correct. Relief from forfeiture. I'm sorry. That's correct. It was relief from forfeiture. And is there any claim that the request for relief for forfeiture was somehow lacking in merit? Not that I know of. I don't believe so. It's all based on this notice aspect. And the other question that I have, just to be clear, the rule is that the California court's denial of ruling in your favor on the appeal would normally be sufficient to establish probable cause unless there was a showing of fraud or perjury. Correct. And that we brought in with the case. And isn't there enough for a jury to conclude here between the email, between the conceded fact that they got notice and there was a broader representation in effect to the court that there was no record of any notice. Isn't there enough to create an issue of fact for a jury on whether or not the judgment was obtained by fraud? I don't think so. And for a couple of reasons. One is that the broader statement, there was no notice. The notice, they still didn't believe that the notice was sufficient under the statute. And that's what the problem is. There was no notice that, there was, it couldn't have meant that there was no notice. The parties all knew that there was some notice because we somehow got it. And they knew that before the litigation was filed. We knew that because of the McQuadden conversation. And Kerry Seidenblatt knew that because he sent in this letter saying, we know you got it. It's just when? That's the whole point. But the court, just to supplement and build on what Judge Corman just asked, the Court of Appeal knows very well that the last notice, the one that was sent directly on January 28th, the Court of Appeal knows very well that that notice was both sent and received. It does. And the Court of Appeal says that notice was insufficient. It does. It's the prior notices that are at issue, and the Court of Appeal says there's no record of those prior notices. And I would submit that this email still doesn't establish that those prior notices were received before Gloria Seidenblatt sent them with her letter on January 28th. The January 21st letter would be, as I understand, the Court of Appeals would fail for the same reason that the January 28th letter failed. It would have. It was too late. It was too late. It was too late. It would have to have been that you got the December 15th letter. It would have. And I don't believe that the email showed that. But there's another, just two more things, and that is that there are two more elements to a malicious prosecution action. There's malice, and there's also no fabled termination, which we have addressed. And the last thing that we also – is that there was no damage here. There's no damage at this level. There's $450,000 in attorney's fees, reasonable attorney's fees, as found by the trial court that we have already paid to Canyon View. What more do they think they should get? They'd like a little bit more. We've taken you well over time. Okay. We'll give you a chance to rebut. Thank you. And now Canyon View. Good morning, Your Honors. Tom Normanton for the appellees and appellants. How much more blood do you want? Yeah. Well, I mean, why are you here? Because my clients were sued in the eyes of my clients. I know, but what damage did they suffer? Yeah. There were additional attorney's fees beyond the fees that were granted by the judge that were incurred after the judge had ruled. Plus there are four individuals who have given declarations, that's the emotional distress that they incurred and the damages to their reputation and their business. All of that is part of the record. I would think that a lot of the damage to their reputation came from the California Court of Appeals finding that they had engaged in fraud themselves and there was certainly nothing wrong with the allegation and the complaint that charged your clients with fraud. Your Honor, my clients in the eyes of the- In fact, you even filed a, you recorded a document that suggested that the lease terminated, that the termination of the lease occurred in December, December 27th, and you couldn't have even terminated the lease until February 13th. So your client is not exactly some virtuous creature that has an unblemished reputation. Well, the Court of Appeal didn't rule on or even consider allegations of fraud against my clients. But they did in a related case, which was, as I understand it, kind of a mirror image of what happened here and what was the name of it, Northwest versus Canyon Estates. Well, different facts, different transactions, Your Honor. They're not very different. As I look at what, as I reconstruct, and I'm totally with Judge Coleman on this point, you get a Court of Appeal opinion that says it looks like fraud to us in the Northwest case, and in fact the opinion in the Northwest version of the case, and by the Court of Appeal prompts Homeside to add a fraud complaint that seemed to me perfectly plausible. Well, they added a fraud complaint after a letter was sent to my clients asking that or giving them an ultimatum to either pay their attorney's fees, give up their rights to the case, agree to give notice thereafter to the law firm on any house in this 400-plus house unit, and to waive any charges on the lease, or they were going to be sued for fraud. And then what happened … That's not precisely how that letter was worded. They started off by saying we're going to add this count, but we'd like to settle the case, and here are the terms that we're proposing, and you turned it down. Yes, and the letter also said unless you agree to these terms, we intend to sue you for fraud and for unfair business practices. And those claims you say had no merit? Yes, I say those claims had no merit, Your Honor. Who else said that? Examine the claims. The claim was asserted against not only Canyon View, but also all four of the Canyon View partners, and not just on joint and several liability or derivative liability that you might have as a partner, but the theory of the complaint was that each and every of these individuals committed all of the acts of fraud. This is a family business, though. This is not unrelated business partners coming together for the purpose of business. I mean, this is a Canyon View is a family business. Well, you have declarations by all of them, including, for example, Mark Seidenlatz and Chris Seidenlatz. I can't think of a reference anywhere in the record where either of these individuals are even mentioned in the paperwork, except in the complaint, but yet they've been sued for fraud, and there are allegations that they acted with malice. Now, that's different than derivative liability, because if you're sued for fraud, and you're accused of malice, and it gets to court, you've got to walk in with your financial statement, and then the jury can assess punitive damages against you. There's not a scintilla of evidence that these individuals ever had anything to do with this. I mean, when the fraud suit was filed. Is there evidence that they didn't? Yes, their own declarations. It's part of the record. All that's covered. Your Honors, and this is really important, and it's important to keep in mind that this was, the prior matter was one complaint was over fairly quickly. This was six years. There were seven complaints that were filed. Each one consists of a separate lawsuit analytically in the eyes of malicious prosecution. When they filed the fraud complaint, we demurred to it, and we said, who at home side heard these people say and do these things? Identify a witness, and we went through motion proceedings that lasted for months, and during those motion proceedings, a trial judge, Judge Heiberger, said, well, you've got a tremendous witness problem, but ultimately he permitted it to go forward because home side was willing to allege that they were induced by the fraudulent acts of these four individuals. Now, during the course of that, in their briefs, the home side lawyers said, well, you know, we can't identify anybody at home side who can actually testify to what they heard or said because there are millions of loans. How can we do that? But nevertheless, after saying you've got a tremendous witness problem, the court permitted the action to proceed. Then we propounded discovery. We said, okay, who are your witnesses? Who's a human being, flesh and blood, that you can bring up here that's going to tell us that Gloria defrauded you, Mark defrauded you, Chris defrauded you, or Carrie defrauded you? Tell us. They objected. And they didn't respond. Now, you're talking about the Hernandez response as they're changing counsels when you said they didn't respond. Is that what you're referring to? I'm referring to this was, Your Honor, this discovery was propounded while Hernandez was still a counsel. I understand that. His law firm obtained an extension and then was substituted out. Correct. I understand. So let me get the dates correct. Yes. So you propound this discovery when? We propound this discovery after the fifth complaint went forward, after the trial judge, after sustaining the demur twice, on the third occasion he says, I'm going to let it go forward, you can do your discovery. And I don't remember which year it was, Your Honor. But I do remember that we propounded this discovery shortly afterward. The Hernandez firm was still a counsel. My recollection is they obtained an extension. In the meantime, the Strzok firm was substituted in. And then ultimately. I've got the dates here and you can confirm if I've got this right. Yes. In December 2002 is when you make these discovery requests. At that point, Hernandez has already been notified that Wamu will replace him and his firm. Hernandez asks for an extension. He gets the extension. The Strzok firm comes in in January 12, 2003. They give evasive answers. That's your characterization. I read the answers. They're basically saying, you know, just boilerplate after boilerplate. We don't know enough. We're brand new and then irrelevant. Every boilerplate answer you could possibly give, they don't answer. But basically they're saying, listen, we just got this case. We don't know the file yet. And then they dismissed the fraud claim on February 20, 2003. Right. Okay. That sounds basically right. Now. Wasn't there a witness by the name of Nancy Stelling of La Quinta who testified to being present when Canyon View made allegedly false representations and there was a claim that the attorney suspected that she may have been the employee at La Quinta who worked on the loan? Your Honor, there was testimony that a Nancy Stelling, who I believe was a broker working for La Quinta, on transactions, on the other transactions, not on this transaction, heard Cary Seidenglanz giving a sales talk. That's the testimony. There was no testimony by this individual that had anything to do with this transaction. You said many sales transactions. I mean, you know, you can draw an inference from that that this was a way that they operated. Your Honor, part of the fraud claim is that my client. I mean, if there was a fraud, somebody in that partnership, that small family partnership was involved in it. Is that right? You're talking about the allegations? Yes. I mean, if there was fraud, if fraudulent representations were made on a regular basis by a partnership that had four members, you could assume that unless they were totally removed from the operations of the partnership, that each individual was at least aware or a party to those false representations. Can't you? No, Your Honor. Why not? Respectfully, you can't. Why not? Because these people own lots of businesses. I mean, you could assume it. There's not a scintilla of evidence that any of the other partners had anything to do with this transaction. The person with the subject of Gloria, the mom, was sent in the office and mailed the notices. And that's part of their fraud claim. The theory is that as an extension of this, it was canny abuse of intent to defraud the lenders by not giving them proper notice. Well, the core of the fraud theory, as I understand it, at least from the criminal court of appeal opinion, is that the terms of the deal are misrepresented such that when the fault happens, both as to the underlying leasehold and as to the mortgage, the mortgage lender is told by panion view, oh, you thought you actually had a security interest in the underlying land and in the home. Too bad you don't. That's the fraud. To the lender, expecting the lender actually had a valid security interest on the home and on the leasehold, whoops, no, you don't. That's the fraud. Not the sending out of the notices. But in the complaint in this case, the notices were part of the alleged fraud that my clients intended as part of this to fail to give the proper notices. And in this instance, the act was the notice on HomeSide. HomeSide did not give their address. The only address in the file was the Asinor SCME. So they mailed it to HomeSide, then Bank Boston, the predecessor, care of SCME. And incidentally, Britten House was the executive vice president of HomeSide for the West Coast. She wasn't just any employee. And there was also testimony by SCME after the appeal that they had a regular practice of receiving and then sending notices. The testimony was, I didn't understand that testimony. The testimony said they had a regular practice of sending it to investors. Well, my recollection of the sense of it in context is they had a regular practice of sending notice. And when it got around to our taking, trying to take the deposition of Washington Mutual slash HomeSide, the person most knowledgeable about the Britten House e-mail is, and we got an order because they wouldn't show up. They refused. So we went into court. We got an order. And once we got an order insisting that they show up, at that point they dismissed. Is there any further questions? At this point, I think not. Thank you, Your Honor. So if you win here, you would get more counsel fees, I take it? You can forswear them if you like. I mean, is that true, that there would be additional counsel fees if you prevailed here? You mean that I would earn as a result of representing my client in court? No, no, not from your clients, but from WAMU. Yes, yes. These were counsel fees that were not passed on by Judge Heiberger. And this is all over emotional distress that your client suffered? Damage to reputation and business. It's all set out in the four declarations. Okay. Good morning. May it please the Court. Alan Lazar, appearing for defendants and appellees. Jesse Hernandez and his law firm, Anderson, McFarland & Connors. I was struck by the lack of argument on our side of the case coming from Canyonview. I mean, yes, Canyonview, and I'm assuming he was going to save that for his rebuttal. And so it's hard for me to comment on that. It should be noted that we never filed a reply brief. We were the appellee. We had one shot. And in our appellee's brief, we laid out in detail the record as to why Jesse Hernandez and his firm did not subject themselves to favorable determination or were not subject to it for some very simple facts. Most importantly, the court of appeal decision, which has been discussed at length here, validating at least reasonableness by an objective standard of his pursuit of the action and the different causes of action while he was counsel of record. What happened in discovery and thereafter that was also discussed, the voluntary dismissals by Strook, Strook & LeVan, the successor firm, and then ultimately the entire lawsuit by Strook on behalf of Homicide's successor, Wamu, Washington Mutual, cannot be imputed to, for purposes of malicious prosecution or an anti-SLAPP motion, favorable termination element to the predecessor attorney. You know, that argument persuaded Judge Bendix. I'm having trouble with that argument because stated in the following way, the argument doesn't make any sense to me. I'm not asking you to concede that the narrative is what happened, so this is hypothetical to make the point as clear as I can make it. Let's have a client and a lawyer. They bring a pretty frivolous lawsuit, one that would pretty clearly be subject to a malicious prosecution suit afterwards. They pursue the suit for a couple of years. The original lawyers bow out. The new lawyers come in and immediately perceive that this is a terrible lawsuit and they enter a voluntary dismissal. Are you saying that merely because the original lawyers who were responsible for bringing the frivolous lawsuit, for pursuing it for two years, are off the hook for frivolous prosecution merely because at the very last minute they substitute out and the new lawyers dismiss because they recognize what a lousy lawsuit it was? Absolutely not, Your Honor. That's the reasoning I think I heard you give me. Well, I didn't say it as artfully as I will try to do it now. I dressed it up, obviously. I didn't really describe your case literally. Well, and that's what I wanted to point out, is in this area of malicious prosecution, general rules are very limited in their usefulness. Their general guidance, they all turn on their own facts. Isn't your argument basically that you get the benefit of the California Court of Appeals decision on the summary judgment because you had no reason to know that the representations that your client was making to the California Court of Appeals was false? You didn't know about this Rittenhouse thing. You basically acted in good faith on what your clients told you. Isn't that the beginning? Well, actually, Your Honor, I'm glad you posed the question that way because as I was listening to argument, I realized that there is a mistaken premise that everyone was arguing, which is receipt of notice is what the Court of Appeal decided. That's not the test that the Court of Appeal ruled on in terms of the timeliness of notice. It's the timeliness of service of notice, and it's discussed with citations to the record on pages 14 through 16 of our brief. Well, you know, the Court of Appeal, I hesitate to criticize the Court of Appeal. At one point earlier, the Court of Appeal says sent, and later the Court of Appeal says served, referring to the same transaction and apparently the same legal test. If I were a law clerk to the Court of Appeal justice who had written that, I would say, you know, you have to make up your mind. Well, Your Honor, I wouldn't quarrel with that, but I don't think this lack of precision in the Court of Appeal is the equivalent of the kind of frivolous lawsuit that Your Honor said might go against the general rule. My problem, as you heard me say, I'm afraid, ad infinitum, maybe even ad nauseam in the earlier argument, is the Rittenhouse email. I don't have any real problem with the fraud suit. It seems to me that the fraud suit was sufficiently justifiable that I would not find malicious prosecution arising out of the fraud suit. My problem is the Rittenhouse email. But as I look at the time sequence in the Rittenhouse email, and this is Judge Carman's point, I believe, the Rittenhouse email comes to light, and I'll now let my dates write, during the deposition in August of 2002. Your client, Mr. Hernandez, declaration says he became aware of this in September of 2002. He then schedules a deposition for Rittenhouse, which he takes in December of 2002. Now, by the time he takes that deposition, he's already been notified that Wallman was taken over and will substitute in a new counsel. Rittenhouse says in the deposition, you know, I can't remember anything. My knowledge is based solely on what's in front of me in this email. Who me? I know nothing. The new lawyers come in on January 12th of 2003. If there's any blame to be attached to Mr. Hernandez and therefore to his law firm, it is that he did not act quickly enough once he learned of the existence of the Rittenhouse email, and it seems to me with that time sequence, he acted perfectly appropriately. Well, with your closing comment, it's hard for me to correlate that. Colleagues on either side of me. But I do want to point out that the claims that we've heard from malicious prosecution are all tied to different versions of these amended complaints. Mr. Hernandez didn't learn of the Rittenhouse email, even as in existence, until after he'd already filed the last complaint that he filed. So, and it was ambiguous enough to not be a decisive moment because Wamu just acquired his client, a new set of lawyers is going to come in, perfectly competent lawyers, and who were not sued, were not added as malicious prosecution defendants. They validate the objective standard, although it's really up to the court, the reasonableness of Hernandez and his firm's conduct for probable cause purposes, objective standard. But I'm just pointing that out. Similarly, other lawyers in the Northwest appeal, you can see, and it's in our appendix, our excerpts, not only the briefs that were taken, it shows that there was a parallel situation of assignee lenders getting the short end of the stick because of this widespread practice by Canyonview. It's also in there that they ultimately went to trial and didn't settle and they won, or they won on appeal. It was affirmed on appeal, and that's in here too. So, since I believe that favorable termination was not established as to my client in the context of the entire case, that's why I briefed the entire case, not just, hey, he was replaced. You look at the context before and after he was substituted in, or substituted out, rather, you'll see that this is the kind of thing that he shouldn't be. It shouldn't be, if a client makes a decision later, how can, for voluntary, to do something voluntary and then disputes that had to do with the merits, how can a predecessor lawyer be shown to have favorable termination against him? Don't see it. Why don't we start out with two minutes for rebuttal, in sequence, if you want rebuttal. You can say you don't want any. Oh, I would like it. Thank you, Your Honor. I call me a fool, but I'd like to still try and convince you on that written house email on just a couple of things. One is, if you compare the language of the written house email to the letter from Cary Seidenglanz, you will see, I think, the Seidenglanz letter is very general, but it states, on May 27, 1998, Matt McRodden of Homesign Lending confirmed that Homesign had received the proper notices. However, there was a breakdown in their procedure, and the notices fell through the crack. That is then, I think, consistent with her email declaration, that statement that comes out later, that's in a totally different context. And the context for it comes up early on, and I think she testified about that. McRodden says, we received proper notice and it fell between the cracks. That maybe is a little imprecise, because he isn't specifying which notice it is, but if he says we got proper notice, that suggests that he got the December 15th notice. Well, maybe, maybe not. The letter is actually one from Cary Seidenglanz, and so I don't know.  There are layers, and obviously Seidenglanz is going to be interpreting this the way he wants to. I want to hear from McRodden as to what McRodden said. And the point being that what we're looking at is whether any reasonable attorney would have thereafter filed a declaratory relief action, and an action for relief from forfeiture based on those facts. And the issue at the beginning was really the legal tenability of the claim, because the other side, Canyon View, was consistently saying over and over and over, you don't even have a lien. And the court of appeals said, you do have a lien. There's a factual issue about notice. There's just too much here for the court to know when that notice occurred or if it did occur. And the court said a few things, but based on what the court of appeals said about notice, and it had this evidence already before it, that it's a tenable claim for somebody to continue with that. That's the first thing. The second thing is on the damage issue. You've given us nearly 19 seconds into our time. If you'd like to sum up. The damages aspect, Your Honor. They've raised this issue about damages. The fact is that their complaint alleges general damages according to proof in the amount of $1 million. Emotional stress is not alleged anywhere in their complaint. It all supposedly came from the fraud claim, which was tenable. So really I don't see that there's any basis for this lawsuit to continue to go on. It violates every policy behind malicious prosecution actions, which it should be over. It should have been over long ago, certainly 14 years after the initial claim was filed. It should be over. Thank you, Your Honor. Would you like two minutes? Yes. I have a quick question. Was Counsel for Hernandez right when he said that you lost, your clients lost the fraud claim to Northwest? Did I hear him correctly? I don't recall that. What I recall was we, in Northwest, went back down to the trial courts that we won on summary adjudication on fraud. And then we went to trial and we won a trial. And then it went up to the Court of Appeal. And the Court of Appeal reversed on a mobile home residency law issue. That's my recollection, Your Honor. So you end up losing but only in the Court of Appeal? Yes. We won a summary adjudication. If I recall correctly, on the fraud, we won a summary adjudication motion. We went to trial. The case was tried and we won the case. And then it was reversed. And reversed as to the fraud? It must have been. It must have been, Your Honor. So you end up losing on the fraud claim? Yes. Okay. So then your clients were found to have engaged in fraudulent activity. No. You said you lost on the fraud claim. Well, I don't think there was a finding in the second appeal that my clients, in that case, engaged in fraud. And the first appeal passed on it as a tribal issue of a summary judgment motion, interpreting the facts liberally for them and strictly against us. My clients in a court of law, to my knowledge, have never, ever been found. What happened on remand? I don't understand. I'm just trying to follow your ---- I'm trying to think back procedurally, Your Honor. I just wanted to be sure I heard him correctly. I thought he said that ultimately there was a trial, that there was no settlement, and your clients lost on the fraud claim. I thought that's what he said. That's why I'm asking you whether that's correct or not. I tried the case, and we won at the trial court level. Okay. After a full trial, we won a substantial amount of attorney's fees, and we went up on appeal. And you won on appeal? No, we lost on appeal, Your Honor. We lost on appeal. So the bottom line is, so what was the end? I'm trying to remember the fraud. I have a recollection the fraud was knocked out by us before we got to trial. And then we went to trial on all the other claims. This was in Norwest. Correct. And we won on all the other claims. And then we went up on appeal, and it turned on a mobile home residency law issue. I don't even remember, as I stand here now, the fraud being argued on appeal. I just don't remember, Your Honor. I just don't remember. But I would remember if the court of appeal on that appeal found that my clients had committed fraud. I would remember that, and I don't remember that. That would definitely stick in my mind. Just briefly on the written house e-mail on this issue of notice, I think it's an admission by an executive vice president of the company that they received the notice from SCME, and they didn't act quickly on it. And that was directly opposite of the testimony that the court of appeal, at least in a couple of instances, noted that this was significant. Because under the mobile home residency law, you don't have to send a process server out. You just mail this stuff. And if they had received it, that would be sufficient. And then the last thing to point out is that the person who testified that they didn't receive notice, Kelly Rawlings, in a subsequent declaration that was filed by WAMU in support of their second summer judgment motion, dropped that testimony. And then that was shortly before they dismissed the suit against my client. And what was wrong with their claim, which basically said that even if we got notice, we want relief from forfeiture? Yes. What was wrong with that claim analytically, Your Honor, is that relief from forfeiture in California is a statute that provides you relief from failure to meet an obligation. It just didn't make sense in this case. It was legally untenable because there was no obligation of WAMU, then Homeside, to do anything. And that was a claim, I recollect, that they amended out. It was an obligation. If they wanted to preserve certain rights, they had to act. Well, that's a way of looking at it, Your Honor. But in the eyes of the law in the cases that we cited, that's not obligation within the forfeiture statute. They could if they wanted to, but that's not an obligation. And my recollection is that's one of the amended out claims that they just eventually, in this series of complaints that were filed against my clients, dropped. You don't have to stand up, ma'am. Of course. I just happen to have that Northwest appellate decision as part of our excerpts. H-Z-E-R. It starts at 225, and it does provide a comprehensive review and disapproval of all of the different theories and issues involving Canyon View. It is a very strong condemnation of the merits of the things that it was asserting. Just now before the court was the question of did it deal specifically with fraud, the fraud claim, that came up as a byproduct of a motion for summary judgment. It's discussed at H-Z-E-R pages 265 through 267. That was on pages 41 through 43 of that appellate decision, which was in 2007. In fact, that came out the same year as Judge Bendix ruled in our case, but it wasn't before the court came out a little later. So I hope that clears that up. What did they say? Oh, they said that they didn't have a viable cause of action. I'm sorry, that there was a viable cause of action for fraud. It had been dismissed again on summary judgment. They reversed that. And then what happened afterwards? I don't know. I wasn't there. I'm assuming it's settled, or I don't know. The consequence would have been then to reverse the summary judgment and to send back for possible trial on the fraud claim. I believe so. I will confess I didn't study this issue. I wasn't expecting to be addressing it. It's just when I heard it, this is where it discusses it. Okay. And since there wasn't any discussion to rebut on favorable termination as to the lawyers, I'll address it. Thank all of you.  My recollection is after that came back down, it was a settlement. So the fraud claim never went forward. It was settled. It was settled after the Court of Appeals found that there was evidence to support a claim of fraud against your clients. A tribal issue, yes. Right. Okay. Thank you. Thank you very much. Case of Canyon View Estates v. FDIC. Jesse Hernandez and his associate firm now submitted for decision. We are on adjournment for the day. Thank you very much. All right. Thank you.
judges: Korman, Farris, Fletcher